Slip Op. 17- 69

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JINAN FARMLADY TRADING CO., LTD., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> v. <br><br> CHRISTOPHER RANCH, LLC, THE GARLIC COMPANY, VALLEY GARLIC, VESSEY AND COMPANY, INC., and FRESH GARLIC PRODUCERS ASSOCIATION, <br><br> Defendant-Intervenor. | Before: Richard W. Goldberg, Senior Judge <br> Court No. 12-00181 |

**OPINION AND ORDER**

[The court finds that the inclusion of the 15-Day Policy in the *Final Results* lacked the support of a reasoned explanation. The court sustains the remaining determinations of Commerce.]

Dated: June 7, 2017

*Robert T. Hume*, Hume & Associates LLC, of Taos, New Mexico, argued for Plaintiff.

*Jane C. Dempsey*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant. With her on the briefs were *Stuart F. Delery*, Principle Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, *Melissa M. Devine*, Trial Attorney, and *Reginald T. Blades, Jr.*, Assistant Director. Of counsel on the briefs were *George H. Kivork* and *Michele D. Lynch*, Office of Chief Counselor for Import Administration, U.S. Department of Commerce, of Washington D.C.

*Michael J. Coursey,* Kelley Drye & Warren LLP, of Washington, D.C., argued for Defendant-Intervenors. With him on the briefs was *John M. Herrmann*.

Goldberg, Senior Judge: Plaintiff Jinan Farmlady Trading Co., Ltd. ("Farmlady") challenged the final determination of Defendant U.S. Department of Commerce ("Commerce") concerning its sixteenth administrative review of the antidumping duty order covering fresh garlic from the People's Republic of China. *Fresh Garlic from the People's Republic of China*, 77 Fed. Reg. 34,346 (Dep't Commerce June 11, 2012) (final admin. review) ("*Final Results*") and accompanying Issues and Decision Memorandum ("I&D Mem."). Farmlady moved for judgment on the agency record under USCIT Rule 56.2. For the reasons discussed below, the court sustains the determinations of Commerce with regard to its calculation of surrogate values and finds unlawful Commerce's actions in announcing its intention to issue liquidation instructions 15 days after the publication of the *Final Results*.

## BACKGROUND

When foreign exporters sell their goods in the United States at less than fair value and to the detriment of U.S. industry, the U.S. Government imposes duties on those goods. 19 U.S.C. § 1673. These "antidumping duties" are calculated by subtracting the foreign product's "export price," or the product's price in the United States, from its "normal value" ("NV"), or the product's price in the exporting country. *See id.* However, when that exporting country has a non-market economy ("NME"), the export-country price cannot be used because the law presumes that government intervention distorts prices in the home market. *See Blue Field (Sichuan) Food Indus. Co. v. United States*, 37 CIT __, __, 949 F. Supp. 2d 1311, 1316–17 (2013). Therefore, to calculate NV for goods made in NME countries, Commerce assigns each of the goods' direct material inputs an artificial market price or surrogate value. 19 U.S.C. § 1677b(c)(1).

The underlying antidumping order in this case covers imports of fresh garlic from China. *Fresh Garlic From the People's Republic of China*, 59 Fed. Reg. 59,209 (Dep't Commerce Nov. 16, 1994) (antidumping duty order). In its sixteenth administrative review of that order, Commerce selected five separate rate respondents, including Farmlady, in addition to two mandatory respondents. *See Final Results*, 77 Fed. Reg. at 34,347-38.

Commerce selected India as the primary surrogate country for purposes of this review, and relied on data from that country to calculate the surrogate values for all factors of production, including chlorine dioxide and packing materials. *See Fresh Garlic from the People's Republic of China: Preliminary Results of the 2009-2010 Antidumping Duty Administration Review*, 76 Fed. Reg. 76,375 (Dep't Commerce Dec. 7, 2011) ("*Preliminary Results*"). The Indian import data covered the period of review and consisted of the unit values of inputs that were imported to India from a range of countries.

For the *Preliminary Results*, Commerce derived the surrogate values for chlorine dioxide and packing materials by calculating their average unit value from the Indian import data. *See* Surrogate Value Mem. for the *Preliminary Results* 2, PD 136 (Dec. 5, 2011) ("Prelim. Surrogate Value Mem."). But Commerce excluded from these calculations any unit values for imports from NME countries. *Id*. In addition, Commerce excluded values of imports to India "from countries which provide generalized subsidies and "imports that were labeled as originating from an 'unidentified' country," because, Commerce "could not be certain that [such imports] were not from either an NME country or a country with general export subsidies." *Id*. At the administrative level, Farmlady raised two objections that it raises again before this court. First, Farmlady objects to Commerce's exclusion of NME imports from the Indian surrogate data. *See* Mem. in Supp. of Mot. for J. on the Agency R. 31, ECF No. 21 ("Farmlady Br."). Second,

Farmlady claims that Commerce was required, but failed, to exclude "aberrational" imports from the Indian surrogate data. *Id.* at 36.

Farmlady also challenges Commerce's policy of issuing liquidation instructions to Customs and Border Protection ("CBP") 15 days after the publication of the final results of an administrative review (the "15-Day Policy"). *Id.* at 56.

## JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) to hear Farmlady's challenge to Commerce's calculation of surrogate values. The court will sustain Commerce's decisions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). This Court has jurisdiction under 28 U.S.C. § 1581(i) to consider Farmlady's challenge to Commerce's policy issuing liquidation instructions 15 days after the publication of the *Final Results*. *See Shinyei Corp. of Am. v. United States*, 355 F.3d 1297, 1304-05 (Fed. Cir. 2004). In reviewing the 15-Day Policy, this Court determines whether Commerce's attendant actions, findings, or conclusions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706; 28 U.S.C. § 2640(e).

## DISCUSSION

**I.     The Court Sustains Commerce's Selection of Data for Surrogate Values.**

As discussed above, in determining the surrogate values for the chlorine dioxide and packing material inputs, Commerce excluded import data that reflected imports into India from NME countries. Prelim. Surrogate Value Mem. 2.

Farmlady argues that Commerce was required to "use all (non-aberrational) imports" from the Indian import statistics to calculate surrogate values. Farmlady Br. 19 n.52. Farmlady

therefore challenges Commerce's calculations of the surrogate values on two grounds. First, Farmlady contests Commerce's decision to exclude from the import statistics any data for imports to India from NME countries. Farmlady Br. 31–36. Second, Farmlady argues that the import statistics on which Commerce relied contained "aberrational" data that distorted the surrogate values for chlorine dioxide and the packing materials. *Id.* at 36–38.

The Government maintains that Commerce's exclusion of Indian import data for imports from NME countries was reasonable because those data were "distorted and are, therefore, unreliable." Def. Opp. to Pl.'s Mot. for J. on the Agency R. 6, ECF No. 27 ("Gov. Br."). In addition, the Government argues that no record evidence demonstrated that any included data were "aberrant, unreliable, or unrepresentative." *Id.* For the following reasons, the court agrees and sustains the determinations of Commerce concerning the selection of surrogate value data.

    A.   *Commerce Did Not Err in Excluding Import Data from NME Countries.*

The relevant statute is silent on the question of how Commerce should derive surrogate values from import statistics. *See* 19 U.S.C. § 1677b(c)(1). The statute does not direct Commerce to either include or exclude import data on imports from NME countries. Rather, Commerce must select and apply the "best available information regarding the values of such factors" in an appropriate surrogate market economy country. *Id.* Because the term "best available information" is not defined by statute, Commerce has broad discretion to determine what constitutes such information. *See Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) (citing *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011)).

Here, Commerce was justified in disregarding any import data concerning imports into India from NME countries. Commerce provided a reasoned explanation for its decision, namely,

that excluding data on imports to India from NME countries followed its "longstanding determination that NME prices are unreliable." I&D Mem. 37. Commerce relied on Indian import data as a means to reducing the distortion presented by China's NME. It follows that it was reasonable for Commerce to infer that any surrogate import data from NME countries are likewise unreliable. This court has previously held that, while a "blanket policy" against ever using NME data cannot be sustained, "it is reasonable for Commerce to infer that data on imports from an NME country are inferior to import data for goods from a market economy country." *Jinan Yipin Corp. v. United States*, 33 CIT 934, 950, 637 F. Supp. 2d 1183, 1195-96 (2009). Ultimately, Commerce's decision to exclude the data was logically consistent with the antidumping statute's general requirement that the agency derive values of NME inputs using the "best available information regarding the values of such factors in a market economy country." *See* 19 U.S.C. § 1677b(c)(1)&(4). Thus, Commerce reasonably disregarded Indian import statistics for imports from NME countries.

Farmlady contends that Commerce's decision to exclude NME import data yielded "grossly distorted" surrogate values. Farmlady Br. 33–34; *see also* Farmlady Case Brief 4, PD 186 (Apr. 20, 2011) ("[T]he Department cannot exclude NME imports since such exclusions distort the 'in' country price equivalent."). Even if true – and Farmlady has not demonstrated that it is – this contention, by itself, is immaterial. Commerce's mandate is to determine *antidumping margins* as accurately as possible. *See Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001) (citing another source). The court in *Shakeproof* held that, because "[t]he process of constructing foreign market value for a producer in a non-market economy country is difficult and necessarily imprecise," Commerce is authorized to augment its use of surrogate values in order to select the

"best available information." *Id.* at 1381–82.  Farmlady demonstrates only that some values for imports into India from NME countries *differ* from the average Indian import values.  In fact, as Farmlady admits, excluded NME import values were higher than the average value for some inputs and lower than the average value for other inputs.  *See* Farmlady Case Brief 12.  Consequently, the impact of Commerce's methodology on the ultimate antidumping margins, if any, is not readily apparent.  Farmlady does not establish that Commerce's decision to exclude NME import data is inconsistent with its obligation to use the best information available.  Specifically, Farmlady does not establish how, if at all, the exclusion of NME import data resulted in distorted *antidumping margins*.

In sum, Commerce's decision to disregard the import data for inputs that were imported to India from NME countries was consistent with the antidumping statute and Farmlady has not cited any evidence to require Commerce to do otherwise.  Commerce's reasoned methodology produced antidumping margins supported by substantial evidence and must be sustained.

    B.  *Commerce Did Not Improperly Include Aberrational Data.*

Farmlady also contends that Commerce's calculation of surrogate values for chlorine dioxide and packing materials was distorted by "aberrational" import data.  Farmlady Br. 36.  However, contrary to Farmlady's assertions, Commerce reasonably determined that its surrogate value calculations did not contain aberrational data.

As an initial matter, Farmlady claims that Commerce failed to evaluate whether the import statistics on which the agency relied contained aberrational data.  *See* Farmlady Br. 36.  But Commerce specifically acknowledged Farmlady's claim and found that there was "no evidence on the record of the instant case that demonstrates that any of the Indian import

statistics used as surrogate values . . . were aberrant, unreliable, or unrepresentative." I&D Mem. 38 & n.175. The court agrees.

Farmlady cites two areas of the record in support of its claim that the chosen import statistics contained aberrational data. First, Farmlady focuses on the data for Indian imports of packaging tape from Nepal, asserting broadly that this data was "aberrational and low" because it reflects a value that is lower than the average value. Farmlady Br. 36. But merely showing that a price is low is not enough. *See, e.g., Ad Hoc Shrimp Trade Action Comm. v. United States*, 38 CIT __, __, 986 F. Supp. 2d 1362, 1370-71 (2014) (finding that labor data from a surrogate country was not "aberrational" just because values were lower than those of data from other potential surrogate countries). Indeed, because an average is necessarily calculated from higher and lower values within a range of numbers, it cannot be the case that a value is aberrant simply because it is lower than the average.

Second, Farmlady contrasts values of Indian imports of chlorine dioxide from Canada, which were $175.50 per kilogram, with the average unit value for all Indian imports of chlorine dioxide, which Farmlady cites as $1.81 per kilogram. Pl. Reply in Supp. of Mot. for J. on the Agency R. 11, ECF No. 30. But Farmlady again fails to establish that the value for Indian imports of chlorine dioxide from Canada was "aberrational." Simply showing that a price is high is not enough. *See Jacobi Carbons AB*, 38 CIT __, __, 992 F. Supp. 2d 1360, 1375-76 (2014).

Farmlady only asserted that low and high import prices were aberrational. But Farmlady failed to provide evidence to show that any subsequent surrogate values were distorted. It is the parties to a proceeding that bear the burden of building an adequate record. *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011). Farmlady does not contend that it was unable to supplement the record with any information that might have shown how "aberrational"

Case 1:12-cv-00181-RWG   Document 69   Filed 06/07/17   Page 9 of 12
Court No. 12-00181                                                                                                                  Page 9

values in the import statistics distorted certain surrogate values. In turn, Farmlady has not demonstrated how any allegedly distorted surrogate values resulted in inaccurate NV or antidumping margins.

Thus, Commerce's determination that there were no aberrational data in the import statistics used to calculate the surrogate values for chlorine dioxide and packing materials was reasonable.

> II.  **Commerce's Inclusion in the *Final Results* of its Intention to Issue Liquidation Instructions 15 Days After the Publication of the *Final Results* was Unlawful.**

Farmlady also challenges Commerce's statement in the *Final Results* that "[t]he Department intends to issue appropriate assessment instructions . . . to CBP 15 days after the date of publication of this notice in the Federal Register." *Final Results*, 77 Fed. Reg. at 34,348. The parties agree that the inclusion of this language is an established policy of Commerce.

Farmlady argues that the 15-Day Policy unlawfully conflicts with the 30-day period interested parties have to commence a civil action under 19 U.S.C. § 1516a(a)(2)(A). Farmlady Br. 56. In response, the Government argues that Farmlady lacks standing to bring this claims and that, in any event, the 15-Day Policy is reasonable and lawful. For the reasons discussed below, the court finds that the 15-Day Policy, in light of the statutory time period for filing an action under 19 U.S.C. § 1516a(a)(2)(A), is unlawful in that it lacks the support of a reasoned explanation.

Under USCIT Rule 3(a) and 19 U.S.C. § 1516a(a)(2)(A), an interested party must file any challenge to the final results of an administrative review within 30 days of the publication of the final results. Once an interested party files both a summons and complaint, it can seek a preliminary injunction against liquidation of its entries pending the resolution of its action. *See* USCIT R. 56.2(a). The inclusion of the 15-Day Policy language in the final results puts an

interested party on notice that it will likely have to file its summons, complaint, and preliminary injunction motion within 15, rather than 30, days from the publication of the final results in order to avoid liquidation of its entries. Farmlady argues that the 15-Day Policy therefore unlawfully truncates the statutory period for preparing and filing a challenge to the final results of an administrative review. *See* Farmlady Br. 58.[1]

The Government makes a number of related arguments concerning the justiciability of Farmlady's claim. *See, e.g.,* Def. Resp. to Ct. Req. for Supp. Briefing 4, ECF No. 46 ("Gov. Supp. Br.") (arguing that "Farmlady raises only hypothetical harm"). However, as this Court has previously found, the 15-Day Policy "causes recurring injury in fact by repeatedly forcing plaintiffs to file the summons, complaint, and motion for a preliminary injunction within fifteen days of publication of the Final Results." *SKF USA Inc. v. United States*, Slip Op. 11-94, 2011 WL 3320637, at *4 (CIT Aug. 2, 2011). Furthermore, this Court has reasoned that the 15-Day Policy is an agency action capable of repetition yet evading review. *SKF USA Inc. v. United States*, 33 CIT 1602, 1614, 659 F. Supp. 2d 1338, 1348-49 (2009), *aff'd in part and vacated in part upon other grounds*, 630 F.3d 1365 (Fed. Cir. 2011). Therefore, the issue is reviewable under an exception to the mootness doctrine. *See Torrington Co. v. United States*, 44 F.3d 1572, 1577 (Fed. Cir. 1995). The court is persuaded by the analyses of its previous rulings, *see, e.g.,*

---

[1]     This Court has previously addressed the interaction of Commerce's 15-Day Policy and the 30-day period for filing a civil action. The court acknowledges that there are divergent decisions on this topic, some of which support the position of the Government and some of which support the position of Farmlady. *See, e.g., SKF USA Inc. v. United States*, 33 CIT 1866, 1890, 675 F. Supp. 2d 1264, 1286 (2009) and *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 28 CIT 1635, 1649, 353 F. Supp. 2d 1294, 1309 (2004), *aff'd*, 146 F. App'x 493 (Fed. Cir. 2005). *But see Mittal Steel Galati S.A. v. United States*, 31 CIT 1121, 1145, 502 F. Supp. 2d 1295, 1316 (2007). None of these decisions are binding here. However, the court is persuaded by the reasoning of those decisions which held that Commerce failed to reconcile the 15-Day Policy with the time allotted for interested parties to file an action challenging the final results of an administrative review under 19 U.S.C. § 1516a(a)(2)(A).

*SKF USA*, 2011 WL 3320637, at *4, and finds that Farmlady's challenge alleges an injury in fact and is justiciable.

With regard to the merits of Farmlady's challenge, the Government correctly points out that "the statute is silent as to when Commerce is to issue liquidation instructions." Gov. Br. 21. Accordingly, this matter is entrusted to Commerce and this Court reviews this agency action with great deference. *See Camargo Correa Metais, S.A. v. United States*, 200 F.3d 771, 773 (Fed. Cir. 1999). But even under this deferential standard, Commerce's actions must be reasonable and "based on a consideration of the relevant factors." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

The Government argues that it has "reasonably filled that statutory gap" because unliquidated entries are deemed liquidated six months after the final results of an administrative review, per 19 U.S.C. § 1504(d). Gov. Br. 21. Thus, the Government reasons, the 15-Day Policy sensibly achieves the goal of ensuring that CBP has enough time to avoid deemed liquidations. But Commerce's justification for the 15-Day Policy evidences no attempt to consider any relevant factors competing with CBP's interests, namely, the interests of parties seeking to investigate, prepare, and file thorough challenges to the final results of an administrative review. On the administrative record of these proceedings, Commerce makes no mention of how the inclusion of the 15-Day Policy language is compatible with the time period allotted to Farmlady under § 1516a or with the practical realities that time period reflects. As a result, the court cannot say that Commerce has reasonably filled the statutory gap. In light of the period of time allotted for filing an action under § 1516a, Commerce's inclusion of the 15-Day

Policy in the *Final Results* was arbitrary, capricious, and unlawful. *See* 28 U.S.C. § 2640(e); 5 U.S.C. § 706(2)(A).

## **CONCLUSION**

The court finds that the inclusion of the 15-Day Policy in the *Final Results* lacked the support of a reasoned explanation. The court sustains Commerce on all other issues.

Accordingly, it is hereby,

**ORDERED** that Plaintiff's Motion for Judgment on the Agency Record Under USCIT Rule 56.2 is DENIED in part and GRANTED in part; it is further

**ORDERED** that the determinations of Commerce concerning the calculation of surrogate values are sustained; it is further

**ORDERED** that Commerce's inclusion, in the *Final Results*, of its intention to issue liquidation instructions 15 days after the publication of the *Final Results* lacked the support of a reasoned explanation and was therefore unlawful.

                                                                             /s/ Richard W. Goldberg  
                                                                              Richard W. Goldberg  
                                                                                  Senior Judge

Dated: June 7, 2017  
New York, New York